FILED BY FAX
PURSUANT TO LOCAL RULES

1  MARC L. GODINO (#182689)
   ROBERT V. PRONGAY (#270796)
2  GLANCY BINKOW & GOLDBERG LLP
   1925 Century Park East, Suite 2100
3  Los Angeles, California 90067
   Telephone: (310) 201-9150
4  Facsimile:  (310) 201-9160
   Email:  mgodino@glancylaw.com
5          rprongay@glancylaw.com

6
   Counsel for Plaintiff Mary Emily Funke
7
   [Additional Counsel on Signature Page]
8
                   UNITED STATES DISTRICT COURT
9
                 NORTHERN DISTRICT OF CALIFORNIA
10
                     SAN FRANCISCO DIVISION
11
                                            **CV 12 5323**
12  MARY EMILY FUNKE, Individually and on    Case No.
    behalf of all others similarly situated,
13
                        Plaintiff,           **CLASS ACTION COMPLAINT**
14
    v.
15                                           **JURY TRIAL DEMANDED**
    DEL MONTE CORPORATION and MILO'S
16  KITCHEN LLC,

17                      Defendants.

18

19

20

21

22

23

24

25

26

27

28

                        CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiff Mary Emily Funke, by and through her attorneys, brings this putative class action on behalf of herself and all other similarly situated persons defined below (the "Class"), against Del Monte Corporation ("Del Monte") and Milo's Kitchen LLC ("Milo's") for damages and injunctive relief. Plaintiff alleges matters pertaining to herself and her own acts upon personal knowledge, and as to all other matters upon information and belief, based upon the investigation undertaken by counsel, as follows:

## INTRODUCTION

1.      In September 2012, Plaintiff Mary Emily Funke fed her dog, Rocky, chicken jerky and beef jerky sold by Milo's ("Milo's Jerky"). At the time, Rocky was in excellent health and had a standard and healthy canine diet. Soon after consuming Milo's Jerky, Rocky became ill, and passed away several days later.

2.      Many dogs who have eaten Milo's Jerky have subsequently gotten sick, or even died, as a result. Since 2007, the Food and Drug Administration ("FDA") has warned that jerky dog treats, especially jerky dog treats produced in China (as Milo's Jerky is), may contain contaminants which cause sickness or even death to dogs that eat the jerky. The FDA has received over 2,000 complaints concerning jerky manufactured by different companies, and at least fifteen complaints from dog owners who fed their dogs Milo's Jerky.

3.      Despite these dangers, Defendants misrepresent, through packaging and websites, that, among other things:

- Milo's Jerky is "wholesome" and "good for pets";
- Milo's Jerky is made with the "same quality ingredients and care" as quality human food;
- Milo's Jerky is "100% jerky";
- Milo's uses a "detailed 17-step safety process, where [Milo's Jerky] is required to pass quality testing during every single phase," which is successful in preventing Milo's Jerky from becoming contaminated; and

- the FDA's investigation of Milo's Jerky and other jerky brands was conducted adequately.

4.    Defendants' misrepresentations and failure to adequately address contamination in Milo's Jerky has caused, and will continue to cause, dogs like Rocky to become sick and/or die. Defendants knew or should have known that Milo's Jerky is unsafe, yet Defendants continue to market and sell Milo's Jerky and moreover, failed to warn Plaintiff and the Class of the dangers associated with Milo's Jerky.

5.    Plaintiff brings this action to stop tragedies like this from occurring, and to compensate dog owners who purchased Milo's Jerky.

## PARTIES

6.    Plaintiff Mary Emily Funke resides in Pacific Palisades, California.  In September 2012, her dog Rocky became sick and died as a direct result of consuming Milo's Jerky.  Plaintiff suffered damages resulting from her purchase of Milo's Jerky, including thousands of dollars in various veterinary costs and the loss of the value of her dog.

7.    Defendant Milo's Kitchen LLC is headquartered at One Maritime Plaza San Francisco, California 94111.    Milo's is a subsidiary defendant Del Monte Corporation. Defendant Milo's manufactures, distributes, and sells Milo's Jerky.  Milo's Jerky is originally produced at a plant in China.

8.    Defendant Del Monte Corporation ("Del Monte"), the owner of Milo's, is headquartered at One Maritime Plaza, San Francisco, California 94111.

9.    Del Monte describes itself, on the "Investor Relations" page of its website, as "one of the country's largest producers, distributors and marketers of premium quality, branded pet products and food products for the U.S. retail market, generating approximately $3.7 billion in net sales in fiscal 2012." Del Monte owns several pet food brands in addition to Milo's, including Meow Mix®, Kibbles 'n Bits®, Milk-Bone®, 9Lives®, Pup-Peroni®, Gravy Train®, Nature's Recipe®, and Canine Carry Outs®.

10. As a parent company and owner of Milo's, Del Monte had complete authority and control over Milo's conduct.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because the matter in controversy, upon information and belief, exceeds $5,000,000, exclusive of interests and costs, and this matter is a class action in which at least two-thirds of Class members are citizens of a different state than that of Defendant. Venue in this Court is proper pursuant to 28 U.S.C. § 1391(a) and (c) since all defendants do business in this District and are headquartered in this District. Each of the Defendants has promoted, marketed, distributed and/or sold Milo's Jerky in this District.

12. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because the acts of Defendants occurred in this County.

## SUBSTANTIVE ALLEGATIONS

### Plaintiff's Dog Dies As A Result Of Eating Milo's Jerky

13. Plaintiff's dog, Rocky, born in 2007, was a King Charles Cavalier Spaniel.[1] Until his death in September 2012, Rocky had no history of health problems, apart from a hip replacement a year earlier.

14. In August 2012, Plaintiff bought Milo's Jerky for Rocky.

15. On September 2, 2012, Plaintiff fed Rocky Milo's Jerky. Within 24 hours, Rocky got sick. Symptoms first arose when Rocky drank an inordinate amount of water, and then vomited the water approximately twelve times.

---

[1] King Charles Cavalier Spaniels are small dogs, and adults generally weigh 13 to 18 pounds. The natural lifespan of this breed is generally between 9 and 14 years. While this breed is prone to mitral valve heart disease, spinal court issues, ear problems, and hip dysplasia, this breed is not typically prone to digestive problems.

16. On September 4, 2012, the day after Rocky developed these symptoms, Plaintiff took Rocky to the veterinarian. The veterinarian prescribed antibiotics to combat these symptoms.

17. However, Rocky's condition quickly deteriorated and he became so sick he could barely walk. Plaintiff returned to the veterinarian with Rocky on September 5, 2012, and the veterinarian gave Rocky fluids intravenously. The veterinarian also kept Rocky in the office to monitor Rocky's failing health.

18. On September 8, 2012, Rocky became so gravely ill that Plaintiff and the veterinarian were forced to euthanize him. After Rocky died, the veterinarian kept Rocky's body and had pathology reports done. One of the reports found that Rocky had: (1) necrotic tissue in his stomach; (2) pancreatitis; and (3) highly elevated liver enzyme levels. Rocky had no other health problems that would explain this pathology. The veterinarian believes (1) that Rocky died from food poisoning and (2) Rocky's food poisoning was caused by eating Milo's Jerky.

19. Plaintiff not only suffered the death of her dog Rocky, but was forced to spend thousands of dollars in veterinary bills to treat Rocky before he died.

20. Upon information and belief, Rocky is only one of hundreds, if not thousands, of dogs across the United States who became sick after eating Milo's Jerky. However, as stated below, since at least 2007, many dogs have become ill after eating jerky such as Milo's Jerky. Much of this jerky, including Milo's Jerky, is manufactured in China.

**The FDA Was Aware Of Possible
Contamination In Jerky Since 2007**

21. On September 26, 2007, the FDA issued a release titled "FDA Cautions Consumers about Chicken Jerky Products for Dogs" which warned:

> The Food and Drug Administration is cautioning consumers of a potential association between development of illness in dogs and the consumption of chicken jerky products also described as chicken tenders, strips or treats. **FDA has received more than 70 complaints involving more than 95 dogs that**

1  **experienced illness that their owners associated with consumption of chicken
2  jerky products.**

         \*\*\*

3  FDA has also received preliminary information from Banfield, The Pet Hospital
4  which suggests an association between exposure to the chicken jerky products and
   signs of gastrointestinal illness (vomiting, diarrhea and bloody diarrhea).

5

6
7  **Dogs that have become ill, typically show the following signs: decreased food
   consumption, although some may continue to consume the treats to the
8  exclusion of other foods; decreased activity or lethargy; vomiting; diarrhea,
   sometimes with blood; and increased water consumption and/or increased
9  urination. Some or all of these signs may be present in any individual. Blood
   tests may indicate kidney failure (increased urea nitrogen and creatinine).
10  Urine tests may indicate Fanconi syndrome (increased glucose). Although
    most dogs appear to recover, some reports to the FDA have involved dogs
11  that have died.**

12
         \*\*\*
13
   [Emphasis added.]
14
15    22.  Rocky exhibited many of the same symptoms described in paragraph 21 above

   after he ingested Milo's Jerky.
16
17    23.  On December 19, 2008, the FDA issued a release titled "Preliminary Animal

   Health Notification - Chicken Jerky Products for Dogs" which revealed that many of the jerky
18
19  products at issue were produced in China, and warned:

20  The Food and Drug Administration (FDA) continues to caution consumers of a
    potential association between the development of illness in dogs and the
21  consumption of chicken jerky products also described as chicken tenders, strips or
    treats. FDA continues to receive complaints of dogs experiencing illness that their
22  owners or veterinarians associate with consumption of chicken jerky products. The
    chicken jerky products are imported to the U.S. from China. FDA issued a
23  cautionary warning to consumers in September 2007.

24  Australian news organizations report the University of Sydney is also investigating
25  an association between illness in dogs and the consumption of chicken jerky in
    Australia. At least one firm in Australia has recalled their chicken jerky product
26  and the recall notification stated the chicken jerky product was manufactured in
    China.
27

28

1   FDA believes the continued trend of consumer complaints coupled with the
2   information obtained from Australia warrants an additional reminder and animal
    health notification.

3                                        ***

4   **FDA is advising consumers who choose to feed their dogs chicken jerky
5   products to watch their dogs closely for any or all of the following signs which
    may occur within hours to days of feeding the product: decreased appetite,
6   although some may continue to consume the treats to the exclusion of other
    foods; decreased activity; vomiting; diarrhea, sometimes with blood; and
7   increased water consumption and/or increased urination. If the dog shows
8   any of these signs, stop feeding the chicken jerky product. Owners should
    consult their veterinarian if signs are severe or persist for more than 24
9   hours. Blood tests may indicate kidney failure (increased urea nitrogen and
    creatinine). Urine tests may indicate Fanconi syndrome (increased glucose).
10  Although most dogs appear to recover, some reports to the FDA have
11  involved dogs that have died.**

12                                       ***

13  [Emphasis added.]

14      24.    On November 18, 2011, the FDA issued a release titled "FDA Continues to

15  Caution Dog Owners About Chicken Jerky Products" which reiterated warnings concerning

16  jerky, especially jerky made in China:

17      **The Food and Drug Administration (FDA) is again cautioning consumers that
18      chicken jerky products for dogs (also sold as chicken tenders, strips or treats)
        may be associated with illness in dogs. In the last 12 months, FDA has seen an
19      increase in the number of complaints it received of dog illnesses associated
        with consumption of chicken jerky products imported from China. These
20      complaints have been reported to FDA by dog owners and veterinarians.**

21      FDA issued a cautionary warning regarding chicken jerky products to consumers
22      in September 2007 and a Preliminary Animal Health Notification in December of
        2008. After seeing the number of complaints received drop off during the latter
23      part of 2009 and most of 2010, the FDA is once again seeing the number of
        complaints rise to the levels of concern that prompted release of our earlier
24      warnings.

25                                       ***

26      **FDA is advising consumers who choose to feed their dogs chicken jerky
27      products to watch their dogs closely for any or all of the following signs that
        may occur within hours to days of feeding the products: decreased appetite;**
28

1
2
3
4
5

**decreased activity; vomiting; diarrhea, sometimes with blood; increased water consumption and/or increased urination. If the dog shows any of these signs, stop feeding the chicken jerky product. Owners should consult their veterinarian if signs are severe or persist for more than 24 hours. Blood tests may indicate kidney failure (increased urea nitrogen and creatinine). Urine tests may indicate Fanconi syndrome (increased glucose). Although most dogs appear to recover, some reports to the FDA have involved dogs that have died.**

6

\*\*\*

7
8
9
10

**The FDA continues to actively investigate the problem and its origin. Many of the illnesses reported may be the result of causes other than eating chicken jerky.** Veterinarians and consumers alike should report cases of animal illness associated with pet foods to the FDA Consumer Complaint Coordinator in their state or go to http://www.fda.gov/petfoodcomplaints.

11  [Emphasis added.]

12      25.     On July 18, 2012, the FDA released a bulletin titled "Questions and Answers

13  Regarding Jerky Pet Treats"[2] which was then updated on August 15, 2012.  This bulletin

14  discussed concerns about various jerky treats, and provided updates on the FDA's investigation of

15  such treats. The updated version of the bulletin provided as follows:

16      **Why did FDA issue a cautionary update in November 2011?**

17
18

In 2011, FDA saw an increase in the number of complaints it received of dog illnesses associated with consumption of chicken jerky products imported from China.

19
20
21
22

FDA previously issued a cautionary warning regarding chicken jerky products to consumers in September 2007 and a Preliminary Animal Health Notification in December of 2008. The number of complaints being received dropped off during the latter part of 2009 and most of 2010. However in 2011, FDA once again started seeing the number of complaints rise to the levels of concern that prompted release of our earlier warnings.

23

24
25
26
27

_____
[2] The bulletin also noted that the FDA tested samples of various brands of jerky for contamination by salmonella, metals, furans, pesticides, antibiotics, mycotoxins, rodenticides, nephrotoxins (such as aristolochic acid, maleic acid, paraquat, ethylene glycol, diethylene glycol, toxic hydrocarbons, melamine and related triazines), as well as other select toxins.  The FDA conducted only four tests on samples of the Milo's Jerky. While none of the four samples tested positive for contamination, this was a limited sample study, and does not in any way demonstrate that Milo's Jerky is safe.

28

Since the issuance of the CVM Update on November 18, 2011, the agency has received numerous additional complaints regarding chicken jerky products.

26.     The bulletin also attempted to explain why it was not conducting a recall of jerky:

**Why aren't these products being taken off the market?**

There is nothing preventing a company from conducting a voluntary recall. It is important to understand that unless a contaminant is detected and we have evidence that a product is adulterated, we are limited in what regulatory actions we can take. The regulations don't allow for products to be removed based on complaints alone. This is an ongoing investigation and FDA will notify the public if a recall is initiated. Currently, FDA continues to urge Dog owners to use caution with regard to jerky pet treat products.

27.     The bulletin discussed the FDA's investigation of jerky facilities in China:

**Has FDA conducted any inspections of facilities in China?**

Yes. During April 2012, FDA conducted inspections of several facilities in China that manufacture jerky pet treats.

**How did FDA determine which facilities to inspect in China?**

FDA selected these firms for inspection because the jerky products they manufacture have been associated with some of the highest numbers of pet illness reports in the U.S.

**What did the FDA learn from the inspections?**

The inspections provided valuable information on the firms' jerky pet treat manufacturing operations, including ingredients and raw materials used in manufacturing, manufacturing equipment, the heat treating of products, packaging, quality control, sanitation, and product testing. Although these inspections helped to identify additional areas that we may investigate, FDA found no evidence indicating that these firms' jerky pet treats are the cause of pet illnesses in the United States.

***

**What is FDA doing in addition to inspecting Chinese manufacturing facilities?**

In follow-up to these inspections, FDA sent a delegation to China in April to express to [the Administration of Quality Supervision, Inspection and Quarantine ("AQSIQ")] our concerns about the complaints we continue to receive concerning jerky pet treat products imported from that country. As a result, FDA and AQSIQ

agreed to expand the investigation of jerky pet treats. In addition to sharing our epidemiological findings with AQSIQ, we initiated a scientific collaboration, and we have taken other steps to attempt to identify the root cause of the illness complaints. FDA and AQSIQ are meeting regularly to share findings and discuss further investigational approaches.

28.     The bulletin also included a spreadsheet detailing complaints received by the FDA. From January 1, 2007 to July 2, 2012, the FDA received fifteen complaints concerning dogs becoming sick after ingesting Milo's Jerky.

**Members Of Congress Criticize the FDA's Investigation Of Jerky Treats**

29.     On July 26, 2012, Senator Barbara Boxer and Congressman Jerry McNerney both wrote to the Honorable Margaret Hamburg, commissioner of the FDA, to request more aggressive action by the FDA concerning tainted jerky treats.

30.     Senator Boxer stated that "I fear that the FDA's warnings have not reached consumers, who through no fault of their own end up purchasing these tainted treats." She urged the FDA "to continue dedicating the necessary resources to find the source of the contamination, take greater steps to alert customers of the dangers posed by them, and pull from the market any products that are found to cause harm."

31.     Congressman McNerney also requested greater action by the FDA, and urged the FDA to "strongly consider" removing jerky from store shelves. He stated that:

> I am aware that the FDA continues to investigate incidents involving chicken jerky, but this problem has persisted for far too long. I strongly urge the FDA to further investigate the origin of these dog treats and why they are toxic. Until the FDA is able to determine what is causing these adverse reactions in pets, the agency should make additional efforts to inform consumers about the potential safety dangers of these products. Depending on safety assessments, the FDA should strongly consider removing any potentially tainted products from store shelves.

32.     On August 24, 2012, Congressman David Kucinich wrote to the Honorable Daniel Levinson, Inspector General of the U.S. Department of Health and Human Services, to "request an immediate investigation into the [FDA's] handling of thousands of complaints about illness and death resulting from jerky treats for dogs."

33.     Congressman Kucinich first noted that the FDA's warnings were insufficient to
protect pet owners and their pets. He stated that "[t]he FDA 'warnings' in this case constituted
mere press releases, requiring no action by the manufacturer, leaving unsuspecting pet owners to
feed their dogs poisoned treats."

34.     Congressman Kucinich also noted that the FDA's inspection of facilities in China
was seriously flawed, and that the failure to conduct a proper inspection gave the false impression
that concerns about jerky treats were unfounded:

> In April of 2012, FDA officials traveled to China to inspect jerky manufacturing
> facilities. The results were not reassuring. **Upon arrival, the inspectors learned
> that they would not be able to take samples back to the U.S. for analysis in a
> U.S. lab. The FDA was, however, able to discover that the raw materials
> (meat) were not being tested for contamination as required.**
>
> The inspectors were also able to learn that the Chinese manufacturers claimed to
> have received few, if any, complaints about their products, even though the FDA
> claims to have transmitted the complaints to the manufacturers. **The inspection
> reports paint a picture of factories that clearly cannot be trusted to produce
> food fit for consumption. The FDA's inaction has effectively declared that the
> food from these factories is perfectly fit for consumption.**

[Emphasis added.]

35.     Congressman Kucinich also criticized the FDA's failure to request or require a
recall:

> The FDA has defended its abject failure to act by claiming it does not have the
> authority to do so until the adulterant(s) is (are) positively identified. It is true that
> if the FDA has not identified an adulterant, it will not be able to initiate a
> mandatory recall. The FDA has broad authority to request a voluntary recall at
> any time.

36.     Congressman Kucinich even called into question the competency and integrity of
the FDA itself, and noted that the FDA was not cooperative concerning his own investigations
into the matter:

> The FDA has also defended its failure to act by claiming it cannot act on
> complaints alone. **If, after five years of investigating, the FDA still has no
> more clues about the chemical or biological culprit than the original**

**consumer complaints, the competency and/or integrity of the investigation is called into question.** I do not make this statement lightly.

My requests for information from the FDA as Ranking Member of the Subcommittee on Regulatory Affairs, Stimulus Oversight and Government Spending of the House Committee on Oversight and Government Reform have not met with the transparency necessary to perform oversight. When I first requested a meeting with the FDA about the complaints, I asked for "considerable scientific detail (about) the scope of potential biological and chemical contaminants for which testing has been conducted, the raw data from such testing with an accompanying summary, methodological protocols, and any other supporting qualitative and quantitative data." **I was given a one page data summary of highly aggregated, non-specific and incomplete data. After exchanges with FDA staff and requests for more data, including specific requests for the results from the part of the investigation involving the trip to China and the complaints, the information was released on their website, but neither my office nor the Subcommittee staff was notified.** The consumer complaints registered until late June of 2012, as well as the inspection reports from the trip to China, were buried in a lengthy Questions and Answers web page. Congressional efforts to perform oversight must not be thwarted.

[Emphasis added.]

## Safeway Voluntarily Stops Selling Milo's Jerky

37.    Even though the FDA failed to act to prevent Milo's Jerky from being sold to consumers, on August 23, 2012, the supermarket Safeway announced that its stores would no carry any Milo's dog treats, including Milo's Jerky, due to the health and safety issues discussed above.

## Del Monte and Milo's Misrepresented
## The Wholesomeness and Safety of Milo's Jerky

38.    Defendants printed misrepresentations concerning the wholesomeness and safety of Milo's Jerky on its packaging. Such misrepresentations include:

- "100% Real – Wholesome and Delicious"
- "We started making Milo's kitchen dog treats because we believe that your dog deserves treats made with the same quality ingredients and care that you want with your food."
- "INGREDIENTS: Chicken Breast, Glycerin, Sugar, Salt, Natural Flavors, Mixed Tocopherals (a Preservative and Natural Source of Vitamin E)"

39.     Similar misrepresentations are made on the Del Monte and/or Milo's websites:

• "Good for Pets"

• "Milo's Kitchen Home-Style Dog Treats are 100% real jerky, sausage slices, and meatballs. We believe dogs deserve treats made with the same quality ingredients and care that you want with your food. We're pet parents too. That's why we make each treat with the love and care your dog deserves."

• "Delicious, whole fillets of 100% jerky"

• "Each tasty piece of Milo's Kitchen Chicken Jerky is made with the quality and care your dog deserves. There are not artificial chicken flavors or filler ingredients. Just meaty, delicious whole fillets of 100% real jerky."

• "That's why we created Milo's Kitchen dog treats. Because in our kitchen, our dogs deserve only the best, and we believe they deserve treats made with the same quality of ingredients and care you want with your food. They deserve to enjoy snacks that not only look like jerky, sausage slices, and meatballs, but actually are 100% real jerky, sausage slices and meatballs. Nothing says, 'I love you' more than something made with love and care."

• "Our products are made with nutritious, quality ingredients that meet the applicable standards and specifications of the U.S. Department of Agriculture (USDA), Association of American Feed Control Officials (AAFCO) and the Food & Drug Administration (FDA). Each of our products is processed and packaged following strict quality-control procedures that comply with the Good Manufacturing Practices established by the FDA. Our Quality Assurance Program is based upon standards compliant with the Global Food Safety Initiative and the FDA. These procedures ensure that the resulting food will be wholesome and safe for your dog."

• "Recently, the U.S. Food and Drug Administration (FDA) posted a notice to make pet parents aware that certain symptoms in dogs (including decreased appetite; decreased activity; increased water consumption and/or increased urination) may be associated with

the consumption of chicken jerky treats made in China. To date, the FDA, American Veterinarian Medical Association (AVMA) and several animal health diagnostic laboratories in the U.S. have not been able to identify any definitive cause or connection between the illness and treats. The FDA also reports that extensive testing of chicken jerky treats has been conducted, but no contaminant has been found. In their notice, the FDA advises consumers that chicken jerky products should not be substituted for a balanced diet and are intended to be fed occasionally in small quantities."

- "To date, the American Veterinarian Medical Association (AVMA), Food and Drug Administration (FDA) and several animal health diagnostic laboratories in the U.S. have not been able to identify any definitive cause or connection between the illness and chicken jerky treats. The FDA reports that extensive testing of chicken jerky treats has been conducted, but no contaminant has been found."

- "There is no recall of Milo's Kitchen chicken jerky or any other Milo's Kitchen dog treats. This is an issue that is not associated with any particular brand and to date FDA and other agencies have been unable to identify any definitive cause or connection between the illness and treats. Despite extensive testing, not contaminants have been found."

40. At some point in 2012, Milo's issues a release titled "Safety and Quality Assurance | Milo's Kitchen® Chicken Jerky Dog Treats" which attempted to reassure consumers that Milo's Jerky was safe:

We understand dogs are part of our families and we share pet parents' #1 priority to keep their dogs safe and healthy. Pet parents can feel confident in treating their dogs with Milo's Kitchen® Chicken Jerky. We put Milo's Kitchen® Chicken Jerky through a detailed 17-step safety process, where it is required to pass quality testing during every single phase. The American Veterinary Medical Association (AVMA) and the FDA have identified no link between illness and chicken jerky treats.

Additionally, no recalls have been issued for any chicken jerky dog treat product in the United States. The makers of Milo's Kitchen® have conducted our own extensive internal testing, all of which has shown our Chicken Jerky to be safe for dogs to enjoy. All Milo's Kitchen® dog treats, including our chicken jerky variety,

1
2

are made with nutritious and quality ingredients that meet the standards and specifications of the United States Department of Agriculture (USDA), the Association of American Feed Control Officials (AAFCO) and the FDA.

3
4
5
6

To ensure that dog treats are both wholesome and safe for your dog, all of our dog treats are packaged following strict quality-control procedures that are in compliance with the Good Manufacturing Practices established by the FDA. Our own Quality Assurance Program is based upon standards compliant with both the Global Food Safety Initiative and the FDA. Further, our detailed 17-step safety process requires quality testing during every single phase.

7
8
9
10
11

With regard to the reports about chicken jerky treats and "Fanconi-like Syndrome," the FDA has thoroughly investigated the complaints. Chicken jerky samples made in China were collected from all over the United States and were found to be free of any toxins, after thorough and extensive testing. The FDA, the American Veterinarian Medical Association (AVMA) and several animal health diagnostic laboratories in the U.S. have identified no connection between the illness and chicken jerky dog treats.

12
13
14

We started making Milo's Kitchen® dog treats because we believe dogs deserve treats made with the same quality ingredients and care that we want for our food. Each of our recipes is carefully prepared to bring out the flavors your dog loves, without using artificial flavors or colors.

15

\*\*\*

16    41.    These misrepresentations are false, deceptive, and/or misleading for the following

17   reasons:

18    a.    Many packages of Milo's Jerky contain contaminants that sicken and/or kill dogs

19          and are thus not "wholesome."

20    b.    A reasonable consumer would not want to eat human food made with the "same

21          quality ingredients and care" that cause such food to be contaminated, causing

22          sickness or death.

23    c.    The ingredient list put forth fails to mention that that many packages of Milo's

24          Jerky also contain contaminants which sicken and/or kill dogs.

25    d.    Milo's Jerky is not "good for pets" because many packages of Milo's Jerky

26          contain contaminants which sicken and/or kill dogs.

27
28

CLASS ACTION COMPLAINT
14

e.   Many packages of Milo's Jerky are not "100% jerky." Rather, many packages of Milo's Jerky have some percentage of contaminants that poison and/or kill dogs.

f.   Although Milo's Jerky, "is processed and packaged following strict quality-control procedures that comply with the Good Manufacturing Practices established by the FDA," many packages of Milo's Jerky are not free of contaminants that poison and/or kill dogs.

g.   While there is "no recall of Milo's Kitchen chicken jerky or any other Milo's Kitchen dog treats," many packages of Milo's Jerky contain contaminants that poison and/or kill dogs.

h.   While the AVMA has not been able to "identify any definitive cause or connection between the illness and" Milo's Jerky, many packages of Milo's Jerky contain contaminants that poison and/or kill dogs.

i.   Milo's "17-step safety process" does not ensure that Milo's Jerky is free of contaminants that poison and/or kill dogs.

j.   While the FDA conducted tests concerning jerky, including Milo's Jerky, and failed to find contamination, this investigation was fundamentally flawed, as detailed by Congressman Kucinich.

**Defendants Failed To Respond Adequately
To The Contamination In Milo's Jerky**

42.   Defendants failed to respond adequately to the contamination in Milo's Jerky. For example:

a.   Defendants failed to conduct adequate quality control of Milo's Jerky;

b.   Defendants failed to adequately test Milo's Jerky;

c.   Defendants marketed and sold Milo's Jerky using deceptive advertising and packaging;

d.   Defendants failed to use proper manufacturing and production practices for Milo's Jerky;

e.      Defendants failed to adequately investigate reports of dogs who became sick and/or died after consuming Milo's Jerky;

f.      Defendants failed to adequately warn consumers about the possibility of dangerous contaminants in Milo's Jerky;

g.      Defendants marketed Milo's Jerky without determining whether it was safe or toxic to dogs;

h.      Defendants sold Milo's Jerky without determining whether it was safe or toxic to dogs; and

i.      Defendants failed to take steps to remove Milo's Jerky from the market once the unsafe condition of Milo's Jerky was suspected or became known.

## CLASS ACTION ALLEGATIONS

43.     Plaintiff brings this class action for injunctive relief, restitution and other equitable and monetary relief on behalf of a class consisting of:

**All persons in the United States who purchased Milo's Jerky at any time from 2007 until the present.**

44.     Excluded from the Class are Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries and assigns.

45.     Within the Class are four subclasses (collectively the "Subclasses") defined as follows:

        a.      Healthy Screening Subclass.      This subclass includes dog owners whose dogs: (i) consumed Milo's Jerky, (ii) were sent to a veterinarian for screening or testing because the pet consumed Milo's Jerky, and (iii) received screening or testing that proved negative.

        b.      Injury Claims Subclass.      This subclass includes dog owners whose pets: (i) consumed Milo's Jerky, and (ii) were treated for symptoms or injuries related to the consumption of Milo's Jerky but did not die as a result of such consumption.

c.     Deceased Animals Claims Subclass.  This subclass includes dog owners whose dogs: (i) consumed Milo's Jerky and (ii) and ultimately died as a result of such consumption.

d.     Consumer Food Purchase Claims Subclass.  This subclass includes dog owners who purchased Milo's Jerky and seek a refund for unconsumed Milo's Jerky.

46.    Plaintiff reserves the right to amend or modify the definition of the Class and Subclasses with greater specificity or further division into subclasses or limitation to particular issues as discovery and the orders of this Court warrant.

47.    Members of the Class and the Subclasses are so numerous that joinder of all members is impracticable.  While the exact number of members of the Class and Subclasses is presently unknown, and can only be ascertained through appropriate discovery, Plaintiff believes that such individuals number in the tens of thousands.

48.    There is a well-defined community of interest in the questions of law and fact underlying the claims of each member of the Class and Subclasses, and these common questions predominate over any questions that may affect individual members of the Class and Subclasses. The common questions of fact and law include, but are not limited, the following:

a.     whether information on Defendants' websites concerning Milo's Jerky was false, deceptive, or misleading;

b.     whether representations made on Milo's Jerky packaging are false, deceptive, and/or misleading;

c.     whether Defendants engaged in unfair, unlawful, and/or fraudulent business practices;

d.     whether Defendants defrauded consumers;

e.     whether Milo's Jerky was materially defective in design and formulation, and unfit for consumption by dogs;

f.     whether Milo's Jerky was contaminated;

g.    whether the Defendants failed to properly test Milo's Jerky prior to bringing it to market;

h.    whether Defendants failed to warn of the dangers posed by consumption of Milo's Jerky;

i.    whether Defendants breached express and/or implied warranties; and

j.    whether Defendants were unjustly enriched.

49.    Plaintiff's claims are typical of the claims of members of the Class and the Subclasses. Plaintiff and all members of the Class and the Subclasses have been similarly affected by Defendants' common course of conduct.

50.    Plaintiff will fairly and adequately represent and protect the interests of the Class and the Subclasses in that she is a typical purchaser of Milo's Jerky. Plaintiff has retained competent counsel with substantial experience in handling complex class action litigation. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the Class and the Subclasses.

51.    Certification of this Class and Subclasses is appropriate because the questions of law or fact common to the respective members of the Class and Subclasses predominate over questions of law or fact affecting only individual members. This predominance makes class litigation superior to any other method available for the fair and efficient adjudication of these claims and provides substantial benefits.

52.    Absent a class action, it would be highly unlikely that Plaintiff or any other members of the Class or Subclasses would be able to protect their own interests because the cost of litigation through individual lawsuits would exceed their expected recovery.

53.    Certification is also appropriate because Defendants acted or refused to act on grounds generally applicable to the Class and Subclasses, thereby making appropriate the relief sought on behalf of the Class and Subclasses as a whole. Further, given the large number of consumers who purchased Milo's Jerky, allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications.

54.     A class action is a fair and appropriate method for the adjudication of the controversy, in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense and burden on the courts that such individual actions would engender. The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, outweigh any difficulties that might be argued with regard to the management of this class action.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATION OF THE CONSUMER LEGAL REMEDIES ACT
### (CAL. CIV. CODE §1750 et seq.)

55.     Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

56.     This First Cause of Action is asserted by Plaintiff on behalf of the Class under California law.

57.     Plaintiff and each member of the Class and Subclasses are "Consumers" as that term is defined by Cal. Civ. Code §1761(d).

58.     Milo's Jerky is a "Good" as that term is defined by Cal. Civ. Code §1761(a).

59.     Defendants are "Persons" as defined by Cal. Civ. Code §1761(c).

60.     The transaction involved herein is a "Transaction" as defined by Cal. Civ. Code §1761(e).

61.     Plaintiff and members of the Class and Subclasses are individuals who have purchased Milo's Jerky for personal use, to feed their dogs. This cause of action is being asserted on behalf of Plaintiff and members of the Class and Subclasses members who purchased Milo's Jerky within the applicable statute of limitations period for this claim.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

62.     Plaintiff has standing to pursue this cause of action because she has suffered injury in fact and has lost money or property as a result of Defendants' actions as set forth herein. Specifically, Plaintiff purchased Milo's Jerky her personal and family use, to feed her dog Rocky, in reliance on Defendants' marketing claims, both on the product labels and on Defendants' websites, with respect to its efficacy, qualities, and safety. Plaintiff, and members of the Class and Subclasses and their families, purchased Milo's Jerky, but it did not work as advertised, in that it made dogs sick, and was not of the quality and standard advertised by Defendants.

63.     Defendants have engaged in, and continue to engage in, business practices in violation of California Civil Code §1750 et seq. (the "Consumers Legal Remedies Act") by making false and unsubstantiated representations concerning the efficacy, qualities, and safety of Milo's Jerky. These business practices are misleading and/or likely to mislead consumers and should be enjoined.

64.     Defendants have engaged in deceptive acts or practices intended to result in the sale of Milo's Jerky in violation of Civil Code §1770. Defendants knew and/or should have known that their representations of fact concerning the efficacy, qualities, and safety of Milo's Jerky were material and likely to mislead the public. Defendants affirmatively misrepresented that Milo's Jerky was of a certain standard and quality with certain benefits which it did not have.

65.     Defendants have represented that Milo's Jerky has characteristics, uses, benefits, or qualities that it does not have. The policies, acts, and practices heretofore described were intended to result in the sale of Milo's Jerky to the consuming public, particularly consumers seeking to provide their dogs with jerky treats that are not harmful, and thus Defendants have violated and continue to violate California Civil Code §1770.

66.     Defendants' conduct alleged herein violates the Consumers Legal Remedies Act, including but not limited to, the following provisions: (1) using deceptive representations in connection with goods or services in violation of Civil Code §1770(a)(4); (2) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have in violation of Civil Code §1770(a)(5); (3) representing that

goods or services are of a particular standard, quality or grade, if they are of another in violation of Civil Code §1770(a)(7); and/or (4) advertising goods or services with intent not to sell them as advertised in violation of Civil Code §1770(a)(9).

67.     Defendants' practices, acts and course of conduct in connection with their promotion and sale of Milo's Jerky, as described above, are likely to mislead a reasonable consumer acting reasonably under the circumstances to his or her detriment. Like Plaintiff, members of the putative Class and Subclasses would not have purchased Milo's Jerky if Defendants had disclosed the truth and all facts concerning Milo's Jerky.

68.     Plaintiff and members of the Class and Subclasses have each been directly and proximately injured by the conduct of Defendants.

69.     Plaintiff seeks restitution of all monies received by Defendants as a result of sales from Milo's Jerky as provided in California Civil Code § 1780. Plaintiff is informed and believes that the amount of said restitution is unknown at this time, but will seek relief to amend this Complaint at the time of trial when the same has been ascertained.

70.     Plaintiff seeks injunctive relief for the CLRA claims alleged in this Complaint. Under the requirements of California Civil Code §1782(a), Plaintiff's counsel have served on Defendants, contemporaneously with the filing of this Complaint, CLRA notice letters. Plaintiff will amend this Complaint to assert claims for additional relief under the CLRA in the event Defendants do not rectify these issues within the appropriate time period outlined in the CLRA

71.     Defendants' wrongful business practices constituted and constitute, a continuing course of conduct in violation of the Consumers Legal Remedies Act since Defendants are still representing that Milo's Jerky has characteristics, uses, benefits and abilities which are false and misleading and have injured Plaintiff and members of the Class and Subclasses.

1

2

**SECOND CAUSE OF ACTION**
**VIOLATION OF FALSE ADVERTISING LAW**
**(CAL. BUS. & PROF. CODE §17500, et seq.)**

3

4

72.    Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

5

6

73.    This Second Cause of Action is asserted by Plaintiff on behalf of the Class and Subclasses under California law.

7

8

9

10

11

12

74.    Plaintiff and members of the Class and Subclasses have standing to pursue this cause of action because Plaintiff and members of the Class and Subclasses have suffered injury in fact and lost money as a result of Defendants' actions as set forth herein. Specifically, Plaintiff and members of the Class and Subclasses purchased Milo's Jerky in reliance on Defendants' marketing claims, as described above.  Plaintiff and members of the Class and Subclasses purchased Milo's Jerky, but it did not work as advertised and in fact caused injury.

13

14

75.    Defendants have engaged in false advertising as they have disseminated false and/or misleading representations about Milo's Jerky.

15

16

17

18

19

20

76.    Defendants knew or should have known by exercising reasonable care that their representations were false and/or misleading.  During the Class Period, Defendants engaged in false advertising in violation of Cal. Bus. & Prof. Code §1750, et seq., by misrepresenting in its advertising and marketing of Milo's Jerky to Plaintiff, the Class, the Subclasses, and the consuming public that Milo's Jerky is safe and that Milo's Jerky and its ingredients have qualities and characteristics that they do not have.

21

22

23

77.    Each of the aforementioned representations alleged in this Complaint was false and/or misleading because Milo's Jerky is not of the standard, quality, or grade-advertised and is in reality unsafe.

24

25

26

78.    By disseminating and publishing these statements in connection with the sale of Milo's Jerky, Defendants have engaged in and continue to engage in false advertising in violation of Bus. & Prof. Code §17500, et seq.

27

28

CLASS ACTION COMPLAINT
22

79.     As a direct and proximate result of Defendants' conduct, as set forth herein, Defendants have received ill-gotten gains and/or profits, including but not limited to, money. Therefore, Defendants have been unjustly enriched. Pursuant to Cal. Bus. & Prof. Code §17535, Plaintiff seeks injunctive relief, restitution and disgorgement of Defendants' ill-gotten gains as specifically provided in Cal. Bus. & Prof. Code §17535.

80.     Plaintiff and members of the Class and Subclasses seek to enjoin Defendants from engaging in these wrongful practices, as alleged herein, in the future. There is no other adequate remedy at law and if any injunction is not ordered, Plaintiff and members of the Class and Subclasses will suffer irreparable harm and/or injury.

### THIRD CAUSE OF ACTION
### VIOLATION OF UNFAIR COMPETITION ACT
### (Cal. Bus. & Prof. Code §17200, et seq.)

81.     Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

82.     This Third Cause of Action is asserted by Plaintiff on behalf of the Class under California law.

83.     Plaintiff has standing to pursue this cause of action because Plaintiff has suffered injury in fact and lost money as a result of Defendants' actions as set forth herein. Specifically, Plaintiff purchased Milo's Jerky in reliance on Defendants' marketing claims on both the product labels and Defendants' websites. Plaintiff purchased Milo's Jerky, but it was not of the standard, quality, and grade advertised.

84.     Defendants' actions as alleged in this Complaint constitute an unfair or deceptive business practice within the meaning of California Business and Professions Code §17200, et seq., in that Defendants' actions are unfair, unlawful and fraudulent and because Defendant has made unfair, deceptive, untrue or misleading statements in advertising media, including the Internet, within the meaning of California Business and Professions Code §17200, et seq.

1

2

3

4

85.     In advertising and packing Milo's Jerky, Defendants make false and misleading statements concerning Milo's Jerky, and refuse to reveal true facts. Defendants do not have the requisite competent and reliable evidence to support the claims about Milo's Jerky made in Defendants' advertising and packaging.

5

6

86.     Defendants' fraudulent and unfair business practices have caused economic injury to Plaintiff and the putative Class and Subclasses.

7

8

87.     Defendants' business practices, as alleged herein, are unlawful because they violate the Consumers Legal Remedies Act and False Advertising Law, as set forth herein.

9

10

11

12

13

14

88.     Defendants knew or should have known by exercising reasonable care that its representations were false and/or misleading. During the Class Period, Defendants engaged in unfair, unlawful and fraudulent business practices in violation of California Business and Professions Code §17200, et seq., by misrepresenting in its advertising and marketing of Milo's Jerky to Plaintiff, members of the Class and Subclasses, and the consuming public that, Milo's Jerky was effective, safe, and had qualities and characteristics that it did not have.

15

16

17

89.     Each of the aforementioned representations alleged in this Complaint was false and misleading because Milo's Jerky was not of the standard, quality or grade advertised, and is in reality unsafe and can cause dogs to become sick or even die.

18

19

20

90.     Defendants' wrongful business practices constituted, and constitute, a continuing course of conduct of unfair competition since Defendants are marketing and selling Milo's Jerky in a manner likely to deceive the public.

21

22

23

24

25

91.     As a direct and proximate result of Defendants' wrongful business practices in violation of Business and Professions Code §17200, et seq., Plaintiff and members of the Class and Subclasses have suffered economic injury by losing money as a result of purchasing Milo's Jerky. Plaintiff and members of the Class and Subclasses would not have purchased or would have paid less for Milo's Jerky had they known that it was not as represented.

26

27

28

92.     Pursuant to Business and Professions Code §17203, Plaintiff and the Class seek an order of this Court enjoining Defendants from continuing to engage in unlawful, unfair or

deceptive business practices and any other act prohibited by law, including those set forth in the Complaint. Plaintiff and members of the Class and Subclasses also seek an order requiring Defendant to make full restitution of all money they wrongfully obtained from Plaintiff and members of the Class and Subclasses.

**FOURTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**

93.     Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

94.     This Fourth Cause of Action is asserted by Plaintiff on behalf of the Class under California law.

95.     "The unjust enrichment claim can be made from common classwide proof." *Westways World Travel, Inc. v. AMR Corp.,* 218 F.R.D. 223, 239 (C.D. Cal. 2003) (certifying a nationwide class where plaintiffs alleged defendants were unjustly enriched through a common scheme.). "Although there are numerous permutations of the elements of the unjust enrichment cause of action in the various states, there are few real differences. In all states, the focus of an unjust enrichment claim is whether the defendant was unjustly enriched. At the core of each state's law are two fundamental elements – the defendant received a benefit from the plaintiff and it would be inequitable for the defendant to retain that benefit without compensating the plaintiff. The focus of the inquiry is the same in each state." *In re Mercedes-Benz Tele Aid Contract Litig.,* 257 F.R.D. 46, 58 (D.N.J. Apr. 24, 2009), (*quoting Powers v. Lycoming Engines,* 245 F.R.D. 226, 231 (E.D. Pa. 2007)).

96.     Plaintiff and members of the Class and Subclasses conferred a benefit on Defendants by purchasing Milo's Jerky.

97.     Defendants have been unjustly enriched in retaining the revenues derived from Class members' purchases of Milo's Jerky, which retention under these circumstances is unjust and inequitable because Defendants misrepresented the facts concerning the qualities,

characteristics, and safety of the product and caused Plaintiff and the Class to lose money as a result thereof.

98.     Defendants have benefited and have been unjustly enriched by their wrongful conduct alleged herein.  Defendants sold Milo's Jerky to Plaintiff and the members of the Class and Subclasses based upon deceptive conduct, omissions, and misrepresentations as to uses and qualities which Milo's Jerky does not possess and which Defendants were, and still are, aware that it does not possess.

99.     Defendants have knowledge of this benefit and have voluntarily accepted and retained this benefit.

100.    Plaintiff and members of the Class and Subclasses suffered a loss of money as a result of Defendants' unjust enrichment because: (a) they would not have purchased Milo's Jerky on the same terms, if at all, if the true facts concerning Milo's Jerky had been known; and (b) they paid a price premium due to the false representations about Milo's Jerky.

101.    The circumstances as described herein are such that it would be inequitable for Defendants to retain these ill-gotten benefits without paying the value thereof to Plaintiff and members of the Class and Subclasses members.

102.    Plaintiff and members of the Class and Subclasses members are entitled to the amount of Defendants' ill-gotten gains, including interest, resulting from Defendants' unlawful, unjust, and inequitable conduct as described above.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and members of the Class and Subclasses request that the Court enter an order or judgment against Defendants, and each of them as named in the future, as follows:

A.      Certification of the action as a class action pursuant to Rule  23(b)(3) of the Federal Rules of Civil Procedure, and appointment of Plaintiff as a Class representative and her counsel of record as Class counsel;

B.      Injunctive relief, and restitution, under the CLRA;

1    C.    Restitution or restitutionary disgorgement as provided in California Business &
2    Professions Code § 17203;

3    D.    Injunctive relief, restitution and appropriate relief under California Business &
4    Professions Code §17500;

5    E.    Attorneys' fees and expenses, including costs for experts;

6    F.    An injunction ordering Defendants to implement an effective remedy for the
7    Milo's Jerky; and

8    G.    Awarding such other and further relief as this Court may deem just and proper,
9    including any extraordinary equitable relief and/or injunctive relief as permitted by law or equity
10   to attach, impound or otherwise restrict Defendants' assets to ensure that Plaintiff and the
11   members of the Class have an effective remedy.

12

13   Dated: October 16, 2012                         GLANCY BINKOW & GOLDBERG LLP

14

15                                                   By:
                                                     Marc L. Godino
16                                                   Robert V. Prongay
                                                     1925 Century Park East, Suite 2100
17                                                   Los Angeles, California 90067
                                                     Telephone: (310) 201-9150
18                                                   Facsimile: (310) 201-9160

19                                                   Gregory B. Linkh
                                                     GLANCY BINKOW & GOLDBERG LLP
20                                                   77 Water Street, 7th Floor
                                                     New York, New York 10005
21                                                   Telephone: (646)722-4180

22                                                   *Counsel for Plaintiff*

23

24

25

26

27

28
                              CLASS ACTION COMPLAINT
                                        27